PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DONIA BARLOW, | ) | |
| | ) | CASE NO.  5:09CV2361 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| AT&T UMBRELLA BENEFIT | ) | |
| PLAN NO. 1, | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| Defendant. | ) | [Resolving ECF Nos. 31 and 33] |

This matter is before the Court upon competing motions for judgment on the administrative record (ECF Nos. 31 and 33) of Plaintiff Donia Barlow ("Plaintiff") and Defendant AT&T Umbrella Benefit Plan No. 1 ("the Plan"), pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  Plaintiff initiated this action seeking judicial review of the Plan's denial of her claim for long-term disability benefits.  ECF No. 1.

After considering the parties' motions for judgment on the administrative record, the Court grants the Plan's motion (ECF No. 33) and denies Plaintiff's motion (ECF No. 31) upon the findings that the Plan set forth specific reasons for the denial of Plaintiff's claim and afforded her a fair opportunity for review.  Final judgment will be entered in favor of the Plan and against Plaintiff pursuant to 29 U.S.C. § 1133.

(5:09CV2361)

## I.  Findings of Fact

1.  At all times relevant hereto, Plaintiff was employed as a design specialist with Ameritech Corporation ("Ameritech") and was a covered person under the Ameritech Sickness and Accident Disability Plan ("SADBP"), also known as the AT&T Umbrella Benefit Plan No. 1 ("the Plan").  *See* ECF No. 30-3 at 90-126.

2.  Under the terms of the Plan, a person is disabled and thus entitled to benefits when they suffer from:

> . . . a sickness or injury, supported by objective medical documentation, that prevents that Eligible Employee from performing the duties of his/her last Company or Participating Company-assigned job with or without reasonable accommodations (as determined by the company or its delegate) or any other job assigned by the Company or Participating Company for which the Eligible Employee is qualified with or without reasonable accommodation (as determined by the company or its delegate). . . .

ECF No. 30-3 at 94.

3.  The Plan gives the Administrator the discretionary authority to construe and interpret the Plan.  *See* ECF No. 30-3 at 109.

4.  On May 8, 2006, Plaintiff was the subject of a disciplinary meeting in which she was suspended from work for three days for an alleged code of conduct violation.  *See* ECF No. 30-3 at 46.

5.  Following the May 8, 2006 incident and the resulting suspension, Plaintiff never returned to work.  *See* ECF No. 30-3 at 82.

2

(5:09CV2361)

6.  On May 19, 2006, Plaintiff filed a disability claim and was sent a letter explaining that the Plan required that she submit all relevant medical documentation of her sickness by June 12, 2006.  *See* ECF No. 30-1 at 4-9.

7.  On June 9, 2006, the Plan wrote to Plaintiff explaining that her claim for disability benefits was being denied because she failed to submit any medical documentation for review. *See* ECF No. 30-1 at 14.

8.  On June 12, 2006, Dr. Debra Lehrer ("Dr. Lehrer"), Plaintiff's primary care physician, wrote a letter to the Plan indicating that Plaintiff had visited her on May 15, May 18, and May 25, 2006 for treatment of severe anxiety and depression due to work related stress.  The letter also indicated that Plaintiff was undergoing counseling treatments and that at that point in time, she was unable to perform her job responsibilities.  *See* ECF No. 30-1 at 17.

9.  On June 16, 2006, the Plan determined that Plaintiff's claim for sickness disability benefits should be denied for the period of May 19, 2006 through her return to work because the "[m]edical information submitted was not sufficient to support the claim" for disability benefits based on the provisions of the Plan.  ECF No. 30-1 at 20.

10.  On June 19, 2006, the Plan issued a denial letter to Plaintiff, which was received on June 21, 2006.  The letter provided that:

> Our determination to deny benefits is based on a review of medical documentation provided by Debra Lehrer, MD on June 12, 2006. . . .  The AT&T IDSC Psychiatric Physician Advisor reviewed the medical information and found it lacking clear documentation to substantiate severity. . . .
>
> The clinical information provided does not support your inability to perform your occupation as a DESIGN SPECIALIST [CWA04] from May 19, 2006 through return to work.

3

(5:09CV2361)

ECF No. 30-1 at 23.  Plaintiff was also advised she could submit a written appeal of the denial, that she could submit additional medical or vocational information, and any fact, data, questions or comments she deemed appropriate for her appeal.  *See* ECF No. 30-1 at 24.

11.  On June 22, 2006, the day after Plaintiff received the letter denying her disability benefits, she began treatment on an inpatient basis at Alliance Community Hospital ("Alliance"). She remained in inpatient treatment until July 17, 2006.  *See* ECF No. 30-1 at 44.

12.  Following her inpatient treatment at Alliance, Plaintiff entered into a partial hospitalization program at Aultman Health Services ("Aultman").  On September 8, 2006, the Plan reviewed newly submitted medical information and approved payment of disability benefits from June 22, 2006 to July 17, 2006 and from July 24, 2006 to August 15, 2006.  The period for which the benefits were approved coincided with the dates Plaintiff had received treatment at Alliance and Aultman.  *See* ECF No. 30-1 at 71.

13.  On June 29, 2006, while Plaintiff was still hospitalized at Alliance, she submitted her appeal form.  The appeal included a note from Dr. Lehrer stating in relevant part:  "Donia is suffering from severe depression, anxieties, and post-traumatic stress.  She is in Alliance Comm. Hospital and has been since June 22, 2006.  She is absolutely disabled at this time, and in my opinion, has been since she has been off work (5/12/06)."  (Emphasis in original.)  ECF No. 30-1 at 115.

14.  At the time the Plan reviewed Plaintiff's appeal, it had the following documents and medical records pertaining to Plaintiff in its possession:

4

(5:09CV2361)

a.  Note, dated February 13, 2006, from Dr. Lehrer describing a conversation with

Plaintiff regarding anxiety, stress, and work issues.  The note indicated Plaintiff was

under an increased amount of job stress; that she was tearful at times; was shaking and

tremulous; and, had severe anxiety.  During the conversation, Plaintiff stated that when

she hears her boss's voice, she develops chest pain and that she must keep her job

because "[t]here is no way that she can afford health insurance if she does not keep this

job." ECF No. 30-2 at 13.

b.  Note, dated May 15, 2006, from Dr. Lehrer stating that Plaintiff was anxious to the

point of almost having a nervous breakdown.  The note indicated that Plaintiff had

another major upset at work, was having great difficulties being able to cope, and felt as

though her immediate supervisor was forcing her out of the workplace.  Dr. Lehrer also

noted that Plaintiff was very tearful, had fleeting thoughts of harming herself, and that

while "[s]he is supposed to go back to work on Friday[,] I doubt she will be mentally able

to do this." ECF No. 30-2 at 12.

c.  Progress notes of Patricia Sacha, M. Ed. LPCC ("Ms. Sacha"), dated May 21, May 23,

June 14, June 21, and June 29, 2006, wherein Ms. Sacha noted that Dr. Lehrer was

referring Plaintiff to her because of "severe depression resulting from recent job loss."

The notes described the events that had occurred the day Plaintiff was suspended.

Plaintiff claimed that her boss called her into an office with management and a union

representative, then refused to allow her to use the bathroom, and tried to prevent her

from going home.  Additionally, Plaintiff reported that she was confused about feeling

5

(5:09CV2361)

badgered by several co-workers and "fe[lt] like she [was] being fired."  The notes also

indicated that Plaintiff "still really want[ed] to return to work . . . but [felt] ashamed of

having been reprimanded in front of co-workers, 'odd woman out'."  ECF No. 30-1 at 83-

89, and 103-104.

d.  Note, dated June 2, 2006, from Dr. Lehrer, which indicated that Plaintiff still suffered

from severe anxiety, stress, and depression but felt as if she was starting to make some

headway as far as being able to process through her humiliation from her maltreatment at

work.  Dr. Lehrer concluded that "[a]t that time, she is still physically disabled" and

"obviously incapable of any type of work."  ECF No. 30-1 at 74.

e.  Records from Alliance from June 22, 2006 through July 17, 2006, which indicated that

during her hospitalization Plaintiff had reported feeling depressed, had trouble sleeping,

and had off and on suicidal ideations.  She also reported being worried about her job

situation, being physically and verbally abused at work, that work was devastating for her

self-esteem, and that she could not go back to work and show her face.  At the time of

Plaintiff's discharge from Alliance, the medical records indicated that Plaintiff's

condition was "cooperative, alert and oriented to time, place and person.  Mood [felt]

somewhat better.  Affect [was] anxious.  [Denied] any hallucinations.  [Denied] any

suicidal or homicidal ideations. . . .  Thought process [was] organized.  Self care and

grooming somewhat improved."  ECF No. 30-1 at 34-62.

f.  Letter, dated August 11, 2006, from Dr. N. Ike ("Dr. Ike"), a psychiatrist at Aultman

where Plaintiff had participated in the outpatient program, which indicated that Plaintiff

6

(5:09CV2361)

had a sad/blunted affect, tearful episodes throughout the day, poor concentration with

impaired thought process, as evidenced by difficulty following instructions of daily

assignments, and memory impairment noted during interaction with staff.  Dr. Ike opined,

"[a]t this time it is my finding that returning to work would incur a level of stress that

would be detrimental to [the] health of this client."  ECF No. 30-1 at 69.

g.  Chart note of Dr. Ike wherein he diagnosed Plaintiff with "[m]ajor depressive disorder

recurrent."  The note also discussed problems at work and how her most recent problems

had created a sense of failure after forty years of continuous employment at the same

place.  ECF No. 30-1 at 70.

h.  Letter, dated September 7, 2006, from clinical counselor Dena D. Hargrove, MA,

LPCC, LICDC ("Ms. Hargrove"), which indicated that Plaintiff "displayed visible signs

of depression, anxiety, and post traumatic stress disorder . . . teared up frequently during

the session, exhibited sad/blunted affect, startled easily, her hands shook visibly, her

voice was soft, she wrote with difficulty, initially was unsure of the date, had to pause

frequently to regain her thought, and reports suicidal ideation."  Based on the assessment,

Hargrove concluded that Plaintiff "is not ready to return to work.  She appears

emotionally and physically fragile and is not capable at this time of dealing with the level

of stress returning to work would entail."  ECF No. 30-1 at 80.

15.  On September 19, 2006, Plaintiff's claim file (including all medical records), along

with her job description, was provided to Robert G. Slack, M.D. ("Dr. Slack"), an independent

(5:09CV2361)

licensed psychiatrist, for the purpose of conducting an independent medical records review.  *See*

ECF No. 30-1 at 105-108, 111.  Dr. Slack, after examining the information, concluded that:

a.  Plaintiff was 61 years of age and had worked for her current employer for more than

forty years.  She had voluntarily left her job on May 8, 2006 following an incident at

work in which she was suspended for three days following a disciplinary meeting

concerning an alleged code of conduct violation.  *See* ECF No. 30-1 at 111-114.

b.  There was little objective information in the record, although there were many

instances of Plaintiff's complaints.  The few mental status examinations indicated the

presence of depressed mood and anxiety, but no other major abnormalities.  Such finding

would certainly have been expected in light of Plaintiff's difficult situation at that time of

her life.  *See* ECF No. 30-1 at 111-114.

c.  There was no evidence that Plaintiff was unable to perform the essential requirements

of her own occupation during the times she was not receiving inpatient and hospital care.

It was clear from the record that Plaintiff was disciplined at work for a code of conduct

violation; this appeared to have been upsetting.  There was significant psychiatric

distress, however, it was clear Plaintiff would never choose to go back to work in her

current setting.  She had made it clear to her providers that she felt she was being treated

unfairly at work and did not wish to return to the situation.  This was not the same as a

psychiatric disability.  *See* ECF No. 30-1 at 111-114.

d.  Plaintiff was not disabled.  Clinical findings were those of a significant reaction with

the psychiatric distress subsequent to a major psychological stressor at work.  Much of

8

(5:09CV2361)

this information was not conveyed to Plaintiff's mental health providers.  This was a legal

or human resource issue, not a psychiatric disability.  *See* ECF No. 30-1 at 111-114.

e.  There was no evidence of psychosis, delirium, or dementia.  The complaints of

suicidality occurred only secondarily after Plaintiff was denied disability benefits

following her decision to leave work.  *See* ECF No. 30-1 at 111-114.

16.  On October 13, 2006, based on Dr. Slack's review of the medical records, the Plan

issued a denial of benefits letter.  The letter indicated, however, that disability benefits were

approved for the period of time Plaintiff was treated at Alliance and Aultman.  The letter also

referenced Dr. Slack's independent review of the medical records and concluded "there was no

clinical evidence of cognitive impairments or functional limitations."  ECF No. 30-1 at 90-91.

17.  On October 13, 2009, Plaintiff filed the present action seeking judicial review of the

Plan's denial of her claim for disability benefits.

## II.  Conclusions of Law

**A.     The Plan's denial of benefits was not arbitrary and capricious.**

1.  When reviewing a plan administrator's decision to deny benefits, the court should

apply a *de novo* standard unless the benefit plan gives the administrator discretionary authority to

determine eligibility for benefits or to construe the terms of the plan.  *Firestone Tire & Rubber*

*Co. v. Bruch,* 489 U.S. 101, 115 (1989).  If the plan administrator is expressly given the

discretion to construe the plan, the court reviews the decision to deny benefits under the

deferential arbitrary and capricious standard.  *Gismondi v. United Techs. Corp.,* 408 F.3d 295,

298 (6th Cir. 2005) (citing *Firestone Tire,* 489 U.S. at 115).  In this case, the language of the Plan

9

(5:09CV2361)

expressly grants the administrator the authority to determine eligibility under the policy.

Specifically, Section 6.2 (f) states:

> The Committee has full discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with Plan terms. The Committees shall determine conclusively for all parties all questions arising in the administration of the Plan and any decision of the Committee shall not be subject to further review.

ECF No. 30-3 at 109. Because of the language of the Plan, the Court must apply the arbitrary and capricious standard of review.

2. The arbitrary and capricious standard of review is the least burdensome form of judicial review. When it is possible to offer a reasonable explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious. *Perry v. United Food and Commercial Workers Dist. Unions 405 & 442*, 64 F.3d 238, 242 (6th Cir. 1995). However, "the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). Rather, the court must review "the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003).

3. ERISA requires a "full and fair" assessment of claims and clear communication to the claimant of the "specific reasons" for a denial of benefits. 29 U.S.C. § 1133. These requirements do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003). One relevant factor in determining whether the administrator

10

(5:09CV2361)

acted in an arbitrary and capricious manner is if the administrator conducts a physical

examination.  *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 295 (6th Cir. 2005).

     4.  In *Calvert,* the Sixth Circuit opined that while "reliance on a file review does not,

standing alone, require the conclusion that [the plan] acted improperly, . . . the failure to conduct

a physical examination - especially where the right to do so is specifically reserved in the plan -

may, in some cases, raise questions about the thoroughness and accuracy of the benefits

determination."  *Id.*  The language of the Plan expressly grants the right to conduct physical

examination.  Section 5.7 states:

> A Disabled Eligible Employee will not be entitled to benefits if he or she declines
> to submit to such examination made by a physician chosen by the Committee. . . .
> If an Eligible Employee fails to provide proper information respecting his or her
> condition [or] fails to furnish objective medical documentation of such condition
> . . . Plan benefits are not payable.

ECF No. 30-3 at 103.

     5.  The Sixth Circuit also draws distinctions between the use of record reviews in physical

disability claims and mental disability claims.  In *Sheehan v. Metropolitan Life Ins. Co.,* 368

F.Supp.2d 228, 254-255 (S.D.N.Y. 2005), the Southern District of New York addressed the

inadequacy of record reviews when determining benefits for someone claiming a mental

disability.  The *Sheehan* Court stated:

> Courts discount the opinions of psychiatrists who have never seen the patient for
> obvious reasons.  Unlike cardiologists or orthopedists, who can formulate medical
> opinions based upon objective findings derived from objective clinical tests, the
> psychiatrist typically treats his patient's subjective symptoms. . . .  Physicians do
> not diagnose or evaluate these different conditions in the same way.

11

(5:09CV2361)

*Id.* at 255.  In *Smith v. Bayer Corp. Long Term Disability Plan*, 275 Fed.Appx. 495 (6th Cir. 2008), the Sixth Circuit used the reasoning set forth in *Sheehan* to find a plan administrator's denial of benefits to be arbitrary and capricious.

6.  In *Smith,* the claimant stopped working due to mental issues.  His medical records indicated that he had been treated for depression related symptoms for almost a year before he quit work.  After he quit work, the medical records showed complaints of decreased concentration as well as difficulty completing tasks such as forgetting to put his car into gear and being incapable of reading a book.  Claimant also complained of mood changes, irritability, depression, and an inability to concentrate.  The plan conducted two separate, independent, record reviews.  Both reviewers concluded similarly that the claimant was not disabled from performing his job or any position for which he could be trained.  Based on the reviews, the Plan denied the claim for disability benefits.  The claimant sought judicial review of the administrative decision.

7.  The district court concluded that the decision to deny the claimant's long-term disability benefits failed to satisfy even the deferential arbitrary and capricious standard.  The district court based its decision on the fact that the only evidence supporting the assertion that the claimant was able to resume his prior job was offered by individuals who never met the claimant personally, despite the difficulties in diagnosing psychological illnesses from medical records. *Smith v. Bayer Corp. Long Term Disability Plan*, 444 F.Supp.2d 856 (E.D.Tenn. 2006).  On appeal, the decision was affirmed in part and vacated and remanded in part.  The Sixth Circuit upheld the district court's decision finding the denial of benefits to be arbitrary and capricious.

12

(5:09CV2361)

The Court of Appeal's decision to uphold the district court's decision, however, was not based

solely on the plan's failure to conduct a physical examination.  The Sixth Circuit placed a great

amount of weight on the quality of the evidence submitted.  The court stated:

> Given this obvious shortfall in the analytical framework used by the experts
> credited by the plan administrator, in conjunction with the numerous factual
> errors, misunderstandings, and analytical omissions of those persons reviewing
> the findings of [the] treating psychiatrists, the administrative record contained no
> reliable evidence to support the conclusion that the [claimant] was competent to
> return to his previous occupation.

*Smith v. Bayer Corp. Long Term Disability Plan*, 275 Fed.Appx. 495, 509 (6th Cir. 2008).  Like

the claimant in *Smith*, Plaintiff asserts that the expert used to discredit the opinions of her treating

physicians made numerous factual errors, misunderstandings, and analytical omissions.

However, the record at least reasonably supports Dr. Slack's conclusions.  The only factual error

Dr. Slack made in his report was a typographical error stating Plaintiff left her job on "05/18/06"

instead of 05/8/06.  *See* ECF No. 30-1 at 111.  This mistake is insignificant.

    8.  Plaintiff takes issue with many of Dr. Slack's findings.  First, Plaintiff claims Dr.

Slack's finding that she had suicidal ideations only after the denial of her disability benefits was

false.  It is true that the first note in the record mentioning actual suicidal ideations is dated June

14, 2006 and Plaintiff's benefits were denied on June 19, 2006.  The note also stated, however,

that Plaintiff was "not a risk for suicide at this time."  It follows that if any of Plaintiff's

physicians would have believed she was a risk for suicide prior to her benefits being denied, she

would have been admitted to inpatient care at an earlier time.  It was not until after her benefits

were denied that Plaintiff was hospitalized for being a risk of suicide.

13

(5:09CV2361)

9.  Second, Plaintiff claims that based on a "normal" mental status exam, Dr. Slack concluded she was able to return to work, even though she was in the process of being admitted to inpatient treatment at Alliance.  Dr. Slack never opined that Plaintiff was able to return to work at the time she was admitted to inpatient treatment at Alliance; but rather approved the benefits for that period.  He simply stated that throughout Plaintiff's treatment at Alliance, her mental status was generally normal with the presence of a depressed mood and anxiety, and that based on her situation these feelings would be normal.  Dr. Slack concluded that because of the normal status of Plaintiff's exam and lack of objective symptoms, there was no evidence that Plaintiff's mental condition was physically preventing her from being able to perform the essential requirements of her own occupation, following her release from Alliance and Aultman.

10.  Third, Plaintiff takes issue with Dr. Slack's finding that she failed to convey "much of the information" about her work problems to her mental health providers and argues that the specific details of the "work stress" should have no bearing on whether Plaintiff was disabled under the Plan.  The Court disagrees; Plaintiff was attempting to obtain long-term disability benefits based on her inability to perform "the duties of her last job or any other job assigned by the company for which she is qualified."  Information of Plaintiff's work problems is relevant to determining whether Plaintiff was incapable of working altogether or was simply choosing not to work because she was embarrassed about being reprimanded and afraid to face her peers.  The specific details of the "work stress," which Dr. Slack was reviewed, gave him the ability to look at Plaintiff's claims as a whole, taking into account her symptoms, statements, and the timing of the claims.  This placed Dr. Slack in a different position than Plaintiff's treating physicians and

14

(5:09CV2361)

allowed him to examine the information each treating physician had or lacked thereof in coming

to the conclusion that Plaintiff was disabled.  The record only shows that the examining doctors

had knowledge of the "work stress," but it is unclear as to what the doctors actually knew about

the events that occurred prior to Plaintiff's symptoms or which physicians had what information.

11.  Fourth, Plaintiff claims that Dr. Slack's finding that she "will never choose to go

back to work in her current setting," ECF No. 30-1 at 113, is a misrepresentation of the record.

While it is true that Plaintiff made statements that she would like to return to work, she also

made numerous representations that would allow one to conclude that she did not intend to return

to work.  Plaintiff indicated that she was embarrassed after being reprimanded in front of her co-

workers, that work was devastating to her self-esteem, and that she could not go back there.

Based on Plaintiff's statements, Dr. Slack's conclusion that Plaintiff did not want to return to

work is reasonable and is supported by the record.

12.  Finally, Plaintiff takes issue with Dr. Slack's statement that there was no evidence of

psychosis, delirium, or dementia, claiming that these conditions were not required for a person to

be disabled under the Plan.  It is true that these conditions were not required in order for a person

to be disabled under the Plan.  The Plan, however, does require the person to show "a sickness or

injury, supported by objective medical documentation," and psychosis, delirium, or dementia

would be common objective conditions that would make someone "disabled" under the language

of the Plan.

13.  While there is a discrepancy between the opinions of the treating physicians and the

record review physician, that a physical examination was not conducted does not support the

15

(5:09CV2361)

finding that the decision to deny benefits was arbitrary and capricious.  Thus, the Court

concludes that Dr. Slack's opinion, although different from the treating physicians, is supported

by facts in the record.

14.  The Plan defines a disability as "a sickness or injury, supported by objective medical

documentation"  ECF No. 30-3 at 94.  If a claimant is unable to support her disability with such

documentation then she is not disabled under the Plan.  Simply because a doctor classifies a

person as "disabled" does not necessarily mean that the person is disabled under the Plan.  All of

Plaintiff's doctors used the word "disabled" regularly in their evaluations.  There is no evidence,

however, that they ever consulted the definition of disability under the Plan.  The foundation of

Plaintiff's claim was a mental disability, the symptoms of which were primarily subjective.

Under the Plan, subjective symptoms are not enough for a person to be "disabled."  While this

may seem harsh, the purpose of requiring objective data is to protect these plans from frivolous

or fraudulent claims.  If disability claims could be based entirely upon subjective claims,

disability benefits would be payable to any participant with subjective and effervescent

symptomology simply because the symptoms were first passed through the intermediate step of

self-reporting to a medical professional.  "In the absence of a requirement of objective evidence,

the review of claims for long-term disability benefits would be meaningless because a plan

administrator would have to accept all subjective claims of the participant without question."

*Hufford v. Harris Corp.*, 322 F.Supp.2d 1345, 1356 (M.D. Fla. 2004) (internal quotation marks

omitted).  While a person with completely subjective symptoms may be disabled, the Plan in

16

(5:09CV2361)

question clearly does not cover such a disability and to require it to do so would be a direct

conflict with the express language of the Plan.

15.  The Plan's denial of benefits was based on a lack of objective medical

documentation, and Dr. Slack was able to give a reasonable explanation, based on the evidence

in the record, as to why he decided Plaintiff was not disabled under the Plan.  Accordingly, the

Court concludes that the decision denying benefits was not arbitrary and capricious.

**B.      The Plan's denial and the appeals decision provided specific reasons for the
          Plan's decision.**

16.  Section 1133(1), 29 U.S.C., requires that a disability plan under ERISA must

"provide adequate notice in writing to any participant or beneficiary whose claim for

benefits . . . has been denied, setting forth the specific reasons for [the] denial, written in a

manner calculated to be understood be the participant."  The purpose of 29 U.S.C. § 1133(1) is to

notify the claimant of the plan's reasons for denying her claim and to afford the claimant a fair

opportunity for review.  *Wenner v. Sun Life Assur. Co.,* 482 F.3d 878 (6th Cir. 2007).  In other

words, the purpose of 29 U.S.C. §1133(1) is to make sure that the participant, whose claim has

been denied, understands why her claim was denied and understands the avenues for recourse

against the administrator.  Plaintiff asserts that the Plan failed to do either.

17.  First, Plaintiff claims that the original denial letter was not specific.  The initial

decision to deny benefits occurred on June 19, 2006.  The denial letter explained that Plaintiff's

claim had been denied because the medical information submitted lacked "clear documentation

to substantiate the severity."  The letter also identified the specific documents used in making the

determination to deny benefits.  ECF No. 30-1 at 23-24.  Taking into account the little

17

(5:09CV2361)

information the Plan had available to it at the time of the initial denial; the letter set forth the

specific reasons for the denial of benefits.  The only information the Plan had at the time of the

initial denial was a half-page letter written by Plaintiff's primary care physician.  Following

Plaintiff's initial disability claim, the Plan sent her a letter with attached instructions explaining

the types of documentation required to sustain a disability claim.  The documentation provided to

the Plan clearly did not meet requirements of the Plan.  The Plan then sent the denial letter to

Plaintiff which stated in plain language that her claim was "lacking clear documentation to

substantiate severity."

        18.  Second, Plaintiff claims that the Plan failed to adequately explain the appeals

process.  The record indicates, however, that both Plaintiff and her physicians understood the

process.  The original denial of benefits letter explained that Plaintiff had the ability to appeal

and to submit additional medical documentation.  On June 29, 2006, the Plan sent Plaintiff a

copy of the appeals procedures, which explained the entire appeals process.  Plaintiff's doctor

also spoke with a plan representative on July 27, 2006.  The representative explained the appeals

process and the type of documentation and information required to sustain a claim for long-term

disability benefits.  In addition, during the appeal process, Plaintiff requested two time extensions

from the Plan, both of which were granted.  This is not the type of behavior one would expect

from a person who did not understand the appeals process.  The record shows Plaintiff was given

a substantial amount of information about the appeals process, and her behavior showed that she

understood the information.

(5:09CV2361)

19.  Lastly, Plaintiff asserts that the final appeal denial suffered from the same flaws, but Plaintiff set forth no evidence and offered no explanation as to why the final letter failed to meet the requirements of 29 U.S.C. §1133.  The denial letter set forth with specificity all of the documentation reviewed in the appeals process.  The letter also explained Dr. Slack's independent record review, gave the reason why the Plan decided to deny long-term benefits, and described Plaintiff's right to bring suit under ERISA.  Based on the evidence in the administrative record, the Court concludes that the Plan met the requirements of 29 U.S.C. §1133 by setting forth the specific reasons for Plaintiff's denial and affording her a fair opportunity for review.


      IT IS SO ORDERED.


  September 30, 2011                            */s/ Benita Y. Pearson*        
Date                                             Benita Y. Pearson
                                         United States District Judge